First case this morning is Bender v. Dudas. Mr. Bender. Thank you, Your Honors. Good morning. This is a Section 32 case. The Congress has issued an order excluding me from practice. My position is that that order is null and void for many, many reasons set out in my brief. I only have a limited period of time, so I'll only make two points. The first point I would make is that none of the found charges in this case meet the definition in 10.1. Therefore, under Section 32, you cannot exclude a practitioner where there has been no showing of gross misconduct, no showing of incompetence, and where none of the charges… How can you take these people's money and give them almost nothing? I didn't. Why isn't that misconduct right at the start? I didn't take their money. That's the second problem. You're paid by the corporation for representing somebody else. That's just supposed to be paid by clients under the American system, not by somebody to represent clients to whom you do not give a full disclosure of the value of what they're receiving. Your Honor, when I took over those cases, they had already been filed in the Patent Office. I understand that. We read your letter in which you gave disclosure. What you didn't tell them in the disclosure is you're going to get something of almost no value for paying us $8,000, $9,000, $10,000, right? But we didn't know that until the Daniels case was decided. We had to resolve the problem of the patterns, and then we could decide what to do about value. And there's a presumption of inchoate patent rights and no presumption of value in any patent application that's filed. Patent applications are property rights, and there's no requirement under the statute that a patent have any type of value whatsoever. These patent applications were already filed. I came in after the fact. Someone had to stand up and represent these clients. Did you ever go to these clients one by one and explain to them, here is the reality of the situation, and talk to – did you sit down with each of your clients and discuss with them what they were engaged in? I can't say I sat down with every one of them, but I did have telephone conversations with most of the 1,150 Gildan clients. They all called me. They all wanted to know what was going on, and I explained to them, look, you have a pending patent application. We have patterns on the drawings. Let's remove the patterns, and we'll see what we'll do after that. Mr. Bender, I think you approached that correctly in terms of telling them and getting rid of these design business, but the one thing that troubles me quite a bit is the fact that you were being paid by this company to handle the cases for these individuals. The company had made a guarantee to the individuals, at least to some of them, that if you don't get your patent, you get your money back. That is correct, isn't it? And you wrote a very good letter, I thought, quite detailed to each of these people, saying at least there's a sample letter in the record explaining all about the difference between utility patents and design patents, which may have been the first time they got that straight, but you left out one key point, which was, hey, by the way, I'm being paid by the company, and the company has promised that you'll get your patent, your money back if I don't get you a good patent, and so I may have a conflict of interest, but is it okay? You never disclosed that to any of these clients, or did you? With all due respect, Your Honor, I may not have said that there was a conflict of interest, because it never occurred to me at that point that any payment to me by the marketing company would impair my judgment. My duty was to my clients. I always held my clients as my primary… It never occurred to you that getting paid by someone other than your client was a problem? None at all. None at all. It happens all the time. How does it happen all the time? Attorney has a right… I'm sorry. How does it happen all the time? Well, there are… It seems quite unusual to me. There are people, there are investment firms that want, you know, patents for their investments. There are foreign companies that want… Okay, but why didn't the money back guarantee create a huge problem in your mind? Because I didn't think the… My interests were not aligned with the marketing company. My interest was solely to protect the patent rights of the individual investors, and I did that to the best of my ability, and I thought I did that rather well. Mr. Benner, you've challenged the RFIs that were propounded to you. Why doesn't the patent office have the right to investigate issues like this and propound RFIs? They do have the right, but they don't have the right to do it in the manner they do it, and that is, as pointed out by the Fourth Circuit, they couple it with a threat of noncompliance in filing a Section 32 proceeding, and there's no safe house, and they do it before a Section 32 proceeding. So there's no supervision, and there's no way to challenge the RFI. Well, you would have a challenge if a disciplinary proceeding ensued. Well, that's exactly what I'm doing. Well, then, why is that? Because the rules, as the Fourth Circuit pointed out, the disciplinary rules do not provide for that discovery before a Section 32 proceeding. You can only have discovery according to the rules after a Section 32 proceeding. Well, this was not necessarily a discovery. This was an investigation. Is there a difference? I don't think there's a difference. The questions propounded are in the nature of interrogatories. To me, it's unchecked. It's unchecked discovery. Isn't this in the interests of practitioners, so that where allegations are raised about wrongdoing, that the practitioner is given the opportunity to respond? Yeah, but it should not be at the point of a gun. I quite agree. Absolutely. Why can't OED present questions and say, look, it's up to you, if you don't want to answer, that's fine. We'll hold it as a concession that the facts stated are true, or we'll draw an inference of guilt even. So that would encourage practitioners to answer the interrogatories without the threat of a gun. Well, it seems to me that there really isn't any difference between what they've done here and what you're suggesting. Well, the Fourth Circuit found a very big difference, and they found that on that basis that there was no way to challenge the unbridled use and the abuse of the OED order. There was in the context of determination of whether the patent office officials were entitled to absolute immunity. But that's only because there was a Bivens action. Look at my case, Your Honor. They made no determination of that functionality. Goldstein could not challenge. Mr. Predator, excuse me. When the court is addressing you, the normal protocol is to wait and then answer. I apologize. We'll extend the same courtesy to you. I apologize. My point, again, is that the patent office—certainly you'll have to agree with me that the patent office has the right to investigate. I absolutely do. And isn't that all that was done here? And your constitutional rights are protected by virtue of the hearings that have ensued in this very case. No. It was the coupling of the threat and the inability to challenge that creates the abuse of the OED RFI. And look at my case. Look at the 20 or so waves of RFIs that I was served with over a six-year period. They served me with RFIs, and they disappeared. I never heard from them again. Who knows what happened? The charges were never brought. They kept doing it over and over again until they said, well, we finally have enough stuff. Let's go to the disciplinary committee. Let's get Bender. We finally have enough on him. With all due respect, I think the use of the OED RFI is quite obnoxious. The way it has been used against me in particular and in general without procedural safeguards that the Fourth Circuit correctly identified. I was going to make another point, but I guess my time is about up. But I just want to say here that none of the found charges are matched before the patent office. And I know you're all focusing on this matter of the guarantee and not disclosing the conflict of interest. But when I took over those cases, I did not appreciate that my role as protecting their patent rights would ever be compromised by any payment. But you had to appreciate there was a problem with the AIC operation because your predecessor had just been disbarred. He wasn't. Well. No, he was not disbarred. He was suspended. He was suspended. And? You knew there was an ethical issue. However, whatever they did to him, you knew there was an ethical issue because you had replaced a man who had been brought up on charges. Absolutely. Of course I did. Of course I knew. I had a copy of his settlement agreement. And in his settlement agreement, it says, I plead guilty to two charges, failure to cooperate and letting somebody else place a signature on. I didn't know he was being investigated at that time in connection with these. All of that happened later when we started getting the patent office RFIs in the mail in those cases. I was kept in the dark. And I had an obligation, I thought, under Roman V. Haas, Roman Haas v. Kristol, to try and cure these cases, try and preserve something for these invention company customers. I did that in good faith. And I insulated myself as much as possible from AIC. I did that by A, charging reasonable fees, and B, only charging for work done after I had done it. I was very much aware of the potential of influence by AIC, and I made it very, very clear to them that I was in charge of patent prosecution. Just as my letter, my engagement letter says, I will do the best I can to protect your patent rights. And I did that. Would you like to preserve some of your rebuttal? Yes. Thank you very much, Mr. Johnson. Mr. Johnson, before we get immersed in the details, help me with a preliminary question. Actually, I've got two, but I'll start with one. Tell me about the standard of review of what we're doing in this case. I take it that his appeal from the agency, from the PTO, went to the district court of the District of Columbia. Is that the statute so far? That's correct. Now, is that an APA-type appeal before the district court? What is it that the district court is supposed to do? The statute doesn't say what the standard of review is to be applied by the district court. What is your understanding of what the standard of review that was applied by the district court is, and where did it come from? The district court was supposed to review the proceedings below for substantial evidence. Why? I mean, where did that standard come from? Your Honor, we believe that that has come from the APA itself. And this court has established that, like the district court, this court's review is of the director's decision, and so this court would determine whether or not there was sufficient evidence to establish that Bender had actually violated the disciplinary rules. Well, that doesn't make good sense to me, initially, because I would have assumed that what's on appeal to us is the judgment of the district court. Isn't that what's appealed to us? That's correct, Your Honor. So I assume we're reviewing – the district court granted summary judgment? That's correct, Your Honor. So we're reviewing the summary judgment of the district court? Yes, Your Honor. Is that right? This court has stated in the Lipman case that, like the district court, this court is actually reviewing. I know he said that, but I don't know that I understand what it means. I'm trying to get a little help in understanding what it means. Are we now to just ignore what the district court did, or are we asking ourselves, were there genuine issues of material fact in dispute before the district court? If not, did the district court properly apply law, which is our usual standard for summary judgment review, or is this case somehow a different kind of animal that I'm not terribly familiar with? I believe that the standard is for this court to review whether or not there's substantial evidence to support the PTO's determination that offender had violated the disciplinarity. In other words, we ignore what the district court did? It's in determining whether or not there was substantial evidence to support – In the district court's opinion, are we determining substantial evidence in the district court's opinion, or are we determining substantial evidence in the record before the agency? Who are we reviewing? I believe it's the agency's determination and whether or not there's evidence in the record. The agency's determination didn't come to us directly. That's right, Your Honor. But based upon this court's decision in Lippman that – Lippman was just saying there's an underlying cause of action that's at stake. I think Judge Blaker has properly pointed out we're reviewing the district court. Now, what's the standard for a district court? It's to determine whether or not there's substantial evidence to support the PTO's determination that – The district court didn't give us evidence of any kind. It gave us a summary judgment. What is the standard for a summary judgment from a district court? That is whether or not there is – Well, this court reviews a district court's grant of summary judgment without them presenting – reapplying the same standard as the district court. Okay. We'll work from there. I have one other question for you, which is I think your case is falling apart. Did you get a new printer or something? I don't know, Your Honor. Will you please see if the government can't find a little better fashion in the future? We will. We'll have to work on getting a better machine. I hope you will. Thank you. Go ahead. Bender was an instrumental figure in a scam that took advantage of over 1,000 unsuspecting inventors and ultimately duped them out of thousands of dollars. He not only turned a blind eye to these inventors' inventions, but he purposely acted against their best interests. He had over 1,000 clients, but he did not speak to them to determine what their inventions were all about, and he did not seek the most meaningful type of invention for their individual inventions. Well, Mr. Bender argues that he came in at the tail end. He's the white knight that came to rescue all these folks. He did write them. One letter that I read from the record is an example of his communication with his clients. He did write them a very thorough letter explaining the situation, explaining the problem with the embellishments on the lawns and how that had to be fixed, explaining that there are questions that may arise, and explaining his view that he thought the patent office's position was incorrect on certain matters, etc., etc. It was a very thorough, comprehensive letter. What's wrong with that? All that Bender did was continue to prosecute design applications. He did not act in the best interest of his clients. And when you look at the engagement letter itself... Of course, the engagement letter, and forgive me for interrupting you, but the engagement letter does talk about getting a design patent. One can certainly claim that the invention broker did a little bit to mislead these folks, but they signed up to get a design patent application filed, and nothing more. That's true, Your Honor. But in this case, Bender teamed with AIC, and he received direct instructions from AIC on how to prosecute his clients' applications, as opposed to looking at their invention and consulting with them as to what was the best type of application that was available to him. He accepted fees from AIC directly for his prosecution, and he did not give his clients full disclosure of his financial relationship with AIC. Was he obligated to? Under all rules, yes, Your Honor. Under our conflict of interest rules, he was required to give his clients full disclosure before he accepted employment from AIC and before he accepted payment from AIC. So it would have been all right to do it under your rules if he had told them this is what he was doing. That's correct, Your Honor. If he had fully disclosed to each inventor his relationship, how much money that he was being paid, up to $15,000 biweekly at some point from AIC, and if they had given adequate consent, then yes, it would have been okay for him to prosecute the applications for these particular inventors. But he didn't give that sort of disclosure. And the reason was because he knew where his money was coming from, and he realized that if he had given them disclosure, then it's possible that that would have severed his relationship with AIC, who was willing to pay him thousands of dollars based upon his unsuspecting inventors' inventions. Bender says that Daniel's decision in some way vindicated his actions. However, Daniel's decision did not deal with any of his ethical violations. Daniel's decision merely concerned whether or not the design applications were entitled to priority. The fact that Bender won the Daniel's decision does not remove the fact that Bender was obligated to inform his clients of critical final rejections from the PTA. What about this question of conduct before the agency? What are we to make of that? I'm not sure I can answer that. Your rules talk about you supervise the way in which lawyers behave before the agency. This activity wasn't before the agency. This activity was off dealing with his own private arrangements with his clients. Why do you have jurisdiction over that? Your Honor, this court has determined that the PTO has broad discretion with the type of discipline that it can impose. And under Kroll, this court determined that both the PTO and the states can discipline a practitioner for the same conduct. And the type of conduct that Bender was allowed to adhere warranted discipline based upon our disciplinary rules. Has any state taken disciplinary action against this record? We don't know, Your Honor. With respect to the RFIs, Bender argues that the Goldstein decision actually assists them. But the Goldstein decision did not discuss the constitutionality of RFIs. That was a case that dealt with the Bivens action. The issue there was only whether or not certain PTO employees... There's certainly some concern with the Fourth Circuit about RFIs, is there not? There is, Your Honor. They were concerned with whether or not there were adequate procedural safeguards in place. But their whole discussion was centered on how it relates to... Do you understand the distinction? Absolutely. Is the patent office taking into consideration the procedural safeguards? Yes, Your Honor. The patent trademark office has. However, with respect to the Goldstein decision itself, they did not hold that the PTO lacked authority to issue RFIs. And nor could it, because the Supreme Court has actually established that administrative agencies, during investigations, do not have to give appraisal or allow confrontation or cross-examination. And beyond that, the Fourth Circuit's decision is not binding on this Court. This Court, in the Umbach decision, has determined that disciplinary actions arise under an act of Congress related to patent laws and that, as a result, this Court has exclusive jurisdiction over disciplinary matters. So only this Court can determine the constitutionality of RFIs. And actually, we think that RFIs are good because they assist the OED director in conducting a thorough investigation. Once the OED director receives an allegation of some form of improper conduct, then the OED director makes a copy of it and sends it out to the practitioner, along with an RFI, to allow the practitioner to respond to the allegation. And each year, in approximately half of the cases in which the practitioners respond, the OED director decides not to take the case to the committee because he's determined, after hearing both sides of the story, that the allegations aren't found. Is the OED director limited or constrained in any way in terms of the number of questions propounded or the period of time over which the questions may be propounded? Are there any restrictions? There aren't any outlined in the OED rules themselves, Your Honor. And what is a practitioner to do if he or she feels that the interrogatory questions go beyond the scope of what might in any way be relevant? Well, a practitioner could do what Bender did not do here, which is complain to the OED director that the RFIs are in some way harassing or burdensome. And then from there, if he gets an adverse decision, he can go to the PTO director. And there, he has a number of remedies. I noticed RFI doesn't stand for request for information. It stands for requirement for information. I assume the failure to respond would in itself affect. You indicate that that's a violation of your rules, right? Non-cooperation. That's correct, Your Honor. They're just amended right here. The regulations themselves require practitioners to respond to RFIs. And that particular language was derived from the ABA model rules of congressional responsibility. It's not something that the PTO pulled out of a hat. They actually received guidance from the ABA's model rules. But that relates to the RFIs in a formal sense relating to the prosecution of patent applications. It's not necessarily to an investigation. Is that right? Or is that not? I don't believe that that's correct, Your Honor. The RFIs under 37 CFR Part 10 relate to investigations that are of a disciplinary nature. The PTO has never come across a case as egregious as this one. That is why the PTO determined and the district court agreed that Fender should be excluded for his violation of the disciplinary act. Are you saying that this exclusion sanction is unique or unusual or? No, the set of facts that we're dealing with here where the practitioner has completely turned his back. The question I'm asking is do you often exclude, sometimes exclude, rarely exclude? Rarely exclude, Your Honor. This is the first case that we've dealt with where an ALJ has determined that a practitioner should be excluded. The very first? Yes, Your Honor. We've never had a case dealing with so many inventors who have been mistreated like this. Why do you get an ALJ from the Environmental Protection Agency who knows presumably relatively little about that? Well, not that that's a necessary consideration, but under the new statute, the 99th statute, you could have used a lawyer from within the agency. Why do you do it that way? It was merely a follow-up to the practice that had taken place earlier. We had used ALJs from different agencies, and we found them to be- Because you didn't have any of your own? That's correct. But now you have your own. And now we have the option of selecting someone internally in the future. But in this particular case, I believe, and I'm not quite certain, that it was just a mere continuation of prior practice of having ALJs from different agencies who had done an exceptional job. Okay, thank you, Mr. Johnson. You have around three minutes. In answer to your question, no state bar has ever taken any action against me. In fact, I have an unblemished record. I've been practicing patent law for 45 years. I've represented thousands of inventors before the Patent Office. It's beyond me how the Patent Office seek to deprive me of my livelihood, strip me of my honor, on grounds that do not even constitute the practice of law before the Patent Office. It's not permissible by the statute. Section 32 says it's got to be gross misconduct, incompetence, or anything meeting the definition of 10.1. None of these charges meet the definition of 10.1. It's a violation of the statute. It's a violation of my constitutional rights. I cannot be excluded on these charges, no matter how horrific you may find them. And I must say that this case is a clinic for how not to conduct a disciplinary process. There is so much other due process violation in this process that we haven't touched upon. I know the Patent Office thinks that it has a privilege of the high ground and the moral right to determine who shall practice before them. But they have to follow the law. They have not followed the law in this case. There are instances where the Commissioner of Patents has made public statements about wanting to disbar me or taking action to disbar me when I was merely under investigation. You cannot, under the law, prejudge a case in advance of a hearing. And they've done that. Look at the violations, the APA violations, 558 and 556, by Harry Modes. Harry Modes investigates me, then gets promoted, becomes the director. Then he adjudicates whether or not I deserve the right to compliance. That's a direct violation of 556. Now, we don't even know if he did make that determination as required under Rule 132. What about the ex-party communications, Mr. Joseph Lola, who sat on the disciplinary committee? You had a commissioner's representative reviewing petitions that I filed to try and get the Patent Office to cooperate with me to orderly process the more than 1,000 design applications. That representative denies my petitions. And then the next thing I see is that Harry Modes is sending him an affidavit. He then sends it to Joseph Lola, and Joseph Lola rejects an application to try and provoke a refund from AIC. That is not kosher. You cannot do that. It's a violation of due process. It's an extreme conflict of interest. It's so hypocritical for Mr. Johnson to come here and say that this is the most egregious case they've ever had. That is such utter nonsense. They don't want attorneys to take referrals from venture marketing companies. They do not want me to win the Daniels case and remain out there as if I was slumping my nose in their face. This is a very vindictive prosecution. There's a lot of- Mr. Bender, do you have a final statement? Yes. I don't believe I deserve to be disbarred. And I hope in your infinite wisdom you'll come to the same conclusion. I do not want to be disbarred, and I don't think I deserve to be disbarred. Thank you very much. Thank you, Mr. Bender. The next case is Henry Vinesar.